WO

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Bernadette Alcozar-Murphy, a single woman, ) | CV-14-2390-TUC-DCB |
| Plaintiff, ) | |
| vs. ) | **ORDER** |
| ASARCO Arizona Inc., et al., ) | |
| Defendants. ) | |

Pending before the Court are Defendant United Steel Workers of America Kearney Local #5252's (USWA #5252) Motion for Summary Judgment (Doc. 62, 63) and Defendant ASARCO LLC (ASARCO) Motion for Summary Judgment (Doc. 64, 65), both filed in July 2016. Plaintiff, Bernadette Alcozar-Murphy (Alcozar-Murphy), responded (Docs. 73, 74, 75) in August 2016. Defendants replied (Docs. 78, 79) in September 2016. The Court heard oral argument on December 12, 2016 and granted the USWA motion from the bench while taking the ASARCO motion under advisement. The Court now rules and elaborates on its ruling from the bench.

**PROCEDURAL BACKGROUND**

This action was originally filed in an Arizona state court and removed to federal court in September 2014. (Doc. 1.) The First Amended Complaint is contained in the state court records lodged with

this federal court upon removal.  (Doc. 1-2.)  In March 2015, the Court denied a Motion to Dismiss and Motion for Sanctions.  (Doc. 29.) On July 31, 2015, USWA #5252 filed a Crossclaim against the ASARCO Defendants (Doc. 3) and the ASARCO Defendants filed a Crossclaim against USWA #5252. (Doc. 41.) A Scheduling Order was entered in August 2015. Defendants ASARCO Arizona Inc. and ASARCO Grupo Mexico were dismissed as parties by the state court. The remaining ASARCO defendant is ASARCO LLC. (Doc. 21.)

**HISTORICAL BACKGROUND**

Plaintiff started work with ASARCO in 2005 as a heavy equipment operator. At the time she was terminated from employment, she was a commercial haul truck driver.  In December of 2012, Alcozar-Murphy suffered a rare physical condition that caused her to become temporarily blind. She applied for and was granted leave time to obtain medical treatment under the Family Medical Leave Act (FMLA). After missing extended time from work under the FMLA, Alcozar-Murphy was released to return to her duties on February 21, 2013. Plaintiff was delayed in her return by Human Resources (HR) Rosa Aguirre (Aguirre), who was requesting additional, detailed return-to-work documents.  This delay led to an HR meeting, where her Union Reps Mark Gonzales and Phil Gomez and HR agreed that there was not a problem. Not being happy with that result, Alcozar-Murphy met with Eric Duarte, Union President. The purpose of the meeting was to allow Alcozar-Murphy to file a grievance against Aguirre for blocking her return to work. The meeting took place for two hours. After the meeting, Alcozar-Murphy reported for work. Later that day, the Plaintiff

discovered that the two hours of time she spent in the meeting were not listed on her time sheet. Alcozar-Murphy accessed her electronic time record, without permission and against proper protocol, to add the non-working hours in which she met with the Union Representatives. When ASARCO discovered Alcozar-Murphy's unauthorized alteration of her time record, it terminated Alcozar-Murphy's employment for dishonesty in violation of company policy. Alcozar-Murphy, a bargaining unit member of the Union, initially elected to grieve the termination of her employment through the Union pursuant to the terms of the Collective Bargaining Agreement between the Union and ASARCO (the CBA). After a delay of over eighteen months, Plaintiff filed her action in state court, which was then removed to federal court.

Plaintiff's Amended Complaint (Doc. 1-2) charged the following: COUNT ONE (ASARCO) - Retaliation for Making a Wage Claim; COUNT TWO (ASARCO) - Family Medical Leave Act Retaliation; and, COUNT THREE (USWA #5252) - Failure to Fairly and Reasonably Represent. Plaintiff requests compensation for back wages, front pay, lost benefits, attorneys fees, costs, emotional distress, pre- and post-judgment interest, and any and all other remedies deemed proper by this Court.

**STANDARD OF REVIEW**

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a

genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 324-25.

If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 250. All reasonable inferences must be drawn in the light most favorable to the nonmoving party. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004). However, it is not the task of the Court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The Court "rel[ies] on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Id.; see also Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010). Thus, "[t]he district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence

is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001). If the nonmoving party fails to make this showing, the moving party is entitled to a judgment. *See Celotex*, 477 U.S. at 323.

**DISCUSSION**

**A. Claims Against ASARCO**

**1. FMLA**

On December 14, 2012, Alcozar-Murphy requested leave under the Family Medical Leave Act (FMLA) related to an eye condition, and ASARCO granted the requested leave. (Doc. 65; DSOF ¶ 5.) ASARCO complied with all provisions of the FMLA when Alcozar-Murphy requested leave for her eye condition, and Alcozar-Murphy received all payments from ASARCO related to her FMLA leave while she was on leave. DSOF ¶¶ 6-7. ASARCO also complied with all provisions of the FMLA when Alcozar-Murphy sought a return to work after she recovered from her eye condition. DSOF ¶ 8. Alcozar-Murphy's agreed upon return to work date from FMLA leave was February 21, 2013. DSOF ¶ 9. On that date, Alcozar-Murphy submitted return to work paperwork to ASARCO human resources employee, Rosa Aguirre. Due to the nature of Alcozar-Murphy's eye condition (temporary blindness) and the nature of her position (commercial haul truck driver), Aguirre requested return-to-work documents with no restrictions listed. Alcozar-Murphy arranged for her physician to provide the correct paperwork, and Alcozar-Murphy returned to work on February 21, 2013 with no delay or loss of pay. DSOF ¶ 10. Further, Alcozar-Murphy returned to the same position and

received the same rate of pay when she returned to work on February 21, 2013 from FMLA leave related to her eye condition. Despite returning to work to the same position, same rate of pay, and on the precise day she was scheduled to return to work (i.e. did not lose any pay due to any slight delay related to arranging a return to work document with no restrictions), Alcozar-Murphy believed Aguirre intentionally delayed her return to work from FMLA leave, so Alcozar-Murphy requested a meeting with her Union representatives to discuss filing a grievance or civil rights claim against ASARCO.[1]

"The FMLA creates two interrelated, substantive employee rights: first, the employee has a right to use a certain amount of leave for protected reasons, and second, the employee has a right to return to his or her job or an equivalent job after using protected leave." *Bachelder v. Am. W. Airlines, Inc.,* 259 F.3d 1112, 1222 (9th Cir. 2001). It is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the act. 29 U.S.C. § 2615(a)(1). "[T]his prohibition encompasses an employer's consideration of an employee's use of FMLA-covered leave in making adverse employment decisions[.]" *Bachelder,* 259 F.3d at 1222.

Congress recognized that, in an age when all the adults in many families are in the work force, employers' leave policies often do not permit employees reasonably to balance their family obligations and

---

[1] Plaintiff never filed this grievance, so the question of whether or not HR mistreated Plaintiff because she took FMLA leave is not properly before this Court. The issue was never exhausted. It can be

their work life. The result, Congress determined, is "a heavy burden on families, employees, employers and the broader society." S.Rep. No. 103-3 at 4, 103d Cong., 2d Sess. (1993). As for employees' own serious health conditions, Congress found that employees' lack of job security during serious illnesses that required them to miss work is particularly devastating to single-parent families and to families which need two incomes to make ends meet. *Id.* at 11–12. As Congress concluded, "it is unfair for an employee to be terminated when he or she is struck with a serious illness and is not capable of working." *Id.* at 11. In response to these problems, the Act entitles covered employees2 to up to twelve weeks of leave each year for their own serious illnesses or to care for family members, and guarantees them reinstatement after exercising their leave rights. 29 U.S.C. §§ 2612(a)(1), 2614(a)(1).

ASARCO granted Plaintiff's FMLA leave request. Plaintiff also officially returned to work with no changes in her status at all. Plaintiff submits no evidence that ASARCO used the taking of FMLA leave as a negative factor in her termination, which occurred after she had already taken the leave and after she had returned to work with no change in her status. 29 C.F.R. § 825.220(c).

Plaintiff's claim in COUNT TWO of the Amended Complaint is based on allegations that ASARCO terminated her, in part, for taking FMLA leave. This allegation has no factual support. To prevail on such a claim, Plaintiff must show "by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in

used by Plaintiff as evidence of retaliatory discharge based on

the decision to terminate her." *Bachelder*, 259 F.3d at 1225. The decision to terminate Plaintiff was made after she had returned to work with all previous benefits and job position in place; after she altered the Long Sheet[2] and before she filed a grievance against HR. The grievance was discussed but never initiated. Plaintiff does not prove this allegation by a preponderance of the evidence that her termination was in any way tied to her taking FMLA leave. ASARCO's motion for summary judgment will be granted on COUNT TWO.

### 2. Retaliatory discharge

Alcozar-Murphy returned to the same position and received the same rate of pay when she returned to work on February 21, 2013 from FMLA leave related to her eye condition. DSOF ¶ 11. Because Alcozar-Murphy believed Aguirre intentionally delayed her return to work from FMLA leave, Alcozar-Murphy requested the meeting with her Union representatives to discuss filing a grievance or civil rights claim against ASARCO. DSOF ¶ 12.

ASARCO did not prevent or attempt to discourage Alcozar-Murphy from filing a grievance or civil rights complaint regarding Alcozar-Murphy's return from FMLA leave. DSOF ¶¶ 14-15. Alcozar-Murphy received compensation for that meeting because an ASARCO supervisor sanctioned, scheduled, and attended the meeting. DSOF ¶ 16. After meeting with Roy Smith, Alcozar-Murphy's Union representatives advised Alcozar-Murphy she had no basis for filing a grievance or civil rights

---

engaging in protected activity.

[2] The Long Sheet is an official computerized ASARCO document created to keep track of employee assignments, regularly scheduled work time, and overtime.

complaint against ASARCO regarding her return from FMLA leave. DSOF ¶ 17. Alcozar-Murphy was not happy with that assessment and requested a follow-up meeting with the Union president at the time, Eric Duarte.

On February 26, 2013, Alcozar-Murphy was scheduled to work B shift from 3:00 pm. to 11:00 p.m. DSOF ¶ 18. Alcozar-Murphy alleges she arrived to work two hours early, at approximately 1:00 p.m., because ASARCO supervisor Roy Smith arranged a meeting with Alcozar-Murphy, Mr. Smith, and Mr. Duarte, her Union representative. DSOF ¶ 19. Both Roy Smith and Eric Duarte agree that Roy Smith did not set up—or plan to attend—the meeting between Alcozar-Murphy and Eric Duarte on February 26, 2013. Rather, Mr. Duarte spoke with Alcozar-Murphy the day before and told her that if she wanted to, she could meet with him before her shift started. DSOF ¶ 20. In fact, Mr. Duarte did not expect any ASARCO supervisor to attend the meeting; rather, he expected to meet with her one-on-one. DSOF ¶ 21.

There is no evidence in the record to support Plaintiff's version of the preliminary facts. No person at ASARCO or the Union told Alcozar-Murphy she would be paid for the time she met solely with Mr. Duarte. DSOF ¶ 22. Alcozar-Murphy alleges she should be paid for attending the meeting on February 26, 2013 because Roy Smith set up the meeting and would be present for the meeting. However, Roy Smith did not set up or attend the meeting. Mr. Smith did not even know about the meeting before it happened. DSOF ¶ 23. No ASARCO representative required or requested Alcozar-Murphy meet with Eric Duarte on February 26, 2013. DSOF ¶ 24.

Alcozar-Murphy has not produced objective evidence, such as any e-mail or written correspondence, demonstrating that her attendance at the meeting with Eric Duarte on February 26, 2013 was mandatory or that ASARCO, through Roy Smith, sanctioned, scheduled, or planned to attend the meeting. DSOF ¶ 25-26. Alcozar-Murphy admits if you meet solely with Union representatives outside of your scheduled shift, you are not paid for that meeting time. DSOF ¶ 27. No provision of the Basic Labor Agreement (BLA) between the Union and ASARCO states that bargaining unit members receive payment for time they meet solely with Union representatives. DSOF ¶ 28. No written ASARCO policy states that Alcozar-Murphy was entitled to payment of wages for time she met solely with Union representatives to discuss filing a grievance or civil rights complaint against ASARCO. DSOF ¶29.

On February 26, 2013, Alcozar-Murphy was not scheduled as a Day Pay supervisor.[3] DSOF ¶ 30. When not scheduled or working as a Day Pay supervisor, Alcozar-Murphy had no reason to access or modify the Long Sheet, and there is no circumstance where a non-supervisor is unilaterally allowed to add overtime without supervisor approval. DSOF ¶ 31. Despite not being scheduled as a Day Pay supervisor, Alcozar-Murphy accessed the Long Sheet and added two hours of overtime next to her name on the Long Sheet. DSOF ¶ 32. After altering the Long Sheet, Alcozar-Murphy removed and discarded the original signed and approved Long Sheet for February 26, 2013 and replaced it with the altered Long

---

[3] A Day Pay Supervisor is a relief foreperson; hourly workers trained to fill in for salaried positions on an on- call or as needed basis; only ASARCO supervisors and employees who have Day Pay supervisor responsibilities have computer access to the Long Sheet.

Sheet she modified. DSOF ¶ 33. No ASARCO supervisor authorized Alcozar-Murphy to access the Long Sheet on February 26, 2013 and add two hours of overtime to the column next to her name, and no ASARCO supervisor signed or approved the modified Long Sheet. DSOF ¶¶ 34-35. If Alcozar-Murphy actually received 5-5 supervisor[4] approval—as she alleges—the 5-5 supervisor, not Alcozar-Murphy, should have accessed the Long Sheet and/or signed off on a modified Long Sheet. ASARCO supervisors Craig Moore and/or Oliver Johnson, both 5-5 supervisors who Alcozar-Murphy admits were in the same building as her when she accessed the Long Sheet (indeed, Alcozar-Murphy alleges they were as close as "two feet away" from her), could have accessed and revised the Long Sheet on February 26, 2013 to add two hours of allegedly approved overtime from the same computer Alcozar-Murphy used to modify the Long Sheet. DSOF ¶ 36. Alcozar-Murphy's Union representative, Eric Duarte, agreed that it is "absolutely" an inappropriate and terminable offense if a Day Pay employee, without supervisor approval, accesses the Long Sheet and adds two hours of overtime to their pay. DSOF ¶ 37.

On March 4, 2013, ASARCO terminated Alcozar-Murphy's employment after an investigation in which ASARCO discovered Alcozar-Murphy unilaterally accessed the Long Sheet herself to add two hours of overtime, interviewed the 5-5 supervisors scheduled on February 26, 2013, and confirmed that no 5-5 supervisor gave Alcozar-Murphy

---

[4] A 5-5 Supervisor is the highest supervisor on a shift; a 5-5 supervisor approves the Long Sheet by signing it and posting the signed copy for public viewing; a 5-5 supervisor must approve any overtime that a Day Pay supervisor inputs onto the Long Sheet; a Day Pay employee cannot approve overtime.

11

approval to access the Long Sheet and add two hours of overtime to her pay. ASARCO terminated Alcozar-Murphy's employment for two reasons: theft and falsification of company documents. DSOF ¶ 38. Had ASARCO not discovered Alcozar-Murphy added two hours of overtime to the Long Sheet on February 26, 2013, Alcozar-Murphy would have received payment for said two hours of overtime. DSOF ¶ 39. Alcozar-Murphy falsified ASARCO documents by accessing the signed and approved version of the Long Sheet for February 26, 2013 and adding two hours of unapproved overtime next to her name. DSOF ¶ 40. ASARCO terminated Alcozar-Murphy's employment for legitimate reasons; namely, timecard fraud.

ASARCO followed the grievance procedure in the Basic Labor Agreement (BLA) with respect to the termination of Alcozar-Murphy's employment. DSOF ¶ 42. ASARCO provided Alcozar-Murphy, through her Union representation, with fair hearings and opportunities to share her version of events leading up to the termination of her employment with ASARCO. DSOF ¶ 43. Despite alleging ASARCO supervisors Jack Oldfather, Oliver Johnson, Craig Moore, and/or Day Pay supervisor Greg Zaragosa were aware of and/or approved of Alcozar-Murphy adding two hours of overtime to the Long Sheet, neither Alcozar-Murphy nor the Union asked any of said supervisors to testify or provide evidence on her behalf at any step of the grievance process. DSOF ¶ 44. Despite alleging ASARCO supervisor Roy Smith arranged the meeting with Alcozar-Murphy and Eric Duarte on February 26, 2013, neither Alcozar-Murphy nor the Union asked Roy Smith to testify or provide evidence of that fact at any step of the grievance process. DSOF ¶ 45. During the grievance process (and in this litigation), neither Alcozar-Murphy nor

the Union ever alleged ASARCO violated any specific provision of the Basic Labor Agreement (BLA) between ASARCO and the Union. DSOF ¶ 46.

ASARCO terminated Alcozar-Murphy's employment for unapproved overtime entries, not because she rightfully demanded pay for two hours of compensable time (as alleged in COUNT ONE) or because she demanded payment for meeting with her Union Representative (as alleged in COUNT TWO). Alcozar-Murphy admits there is no specific provision in the BLA between ASARCO and USWA #5252 which provides payment (let alone overtime) for non-working time in which she met solely with her Union representative, so ASARCO did not violate the BLA (as alleged in COUNT THREE).

Alcozar-Murphy alleges in her Response, in direct contravention of his actual testimony, that Union President Eric Duarte testified that "the BLA required Alcozar-Murphy be paid for attending the meeting [on February 26, 2013]…" (PResponse, p. 12.) The following section of Eric Duarte's deposition transcript (97:1-6), produced in support of ASARCO's DSOF ¶ 28, directly contradicts Alcozar-Murphy's allegations:

Q: Let me get back to my original question though, which was in the contract [BLA] as you understand it, is there a written provision saying that employees are entitled to be paid for meeting solely with you, with no ASARCO representative?

A: No.

Alcozar-Murphy alleges she was scheduled in a "Day Pay" supervisory role on February 26, 2013, ostensibly to argue she had reason/authority to access the Long Sheet that day. ("On February 26, 2013, Alcozar-Murphy was scheduled to work her regular Day Pay shift

from 3:00 pm to 11:00 pm."). CSOF ¶ 18. The transcript section (46:9-23) from Alcozar-Murphy's deposition referenced in "support" for said allegation is directly contradictory:

Q: Now, on – and so that meeting was set to occur February 26th?
A: That's correct.
Q: And do you remember your scheduled shift for that day?
A: Yes, B shift from 3:00 to 11:00.
…
Q: Okay. Did you believe that you were on day pay status that day?
A: No, sir.

Alcozar-Murphy quotes sections from Eric Duarte's deposition testimony to give the appearance ASARCO violated Notice provisions of the BLA. Specifically, the following portion of Mr. Duarte's deposition transcript (106:14-24) is expressly quoted by Alcozar-Murphy in her Response at p. 7 and in support of CSOF ¶ 31, but the bold section (106:25-107:2) is left out:

Q: Okay. I'm a little confused as to the three-day notice issue with regard to termination. Did ASARCO initially – my understanding is they initially suspended Ms. Alcozar-Murphy, pending a hearing; is that your is that your understanding?
A: My understanding, they told me they wanted to have a meeting to discuss potential suspension. And when we showed up, it was a termination hearing.
Q: Okay. And was it your understanding that ASARCO could terminate an employee for dishonest acts without a three-day notice?
A: At that point in time, no.
Q: Is it your understanding now, that there's a provision that allows them to do that?
A: Yes.

A.R.S. § 23-1501 was enacted as part of the Arizona Employment Protection Act (AEPA), which "was intended to narrow the availability of wrongful termination claims." *Galati v. America West Airlines, Inc.*, 205 Ariz. 290, 69 P.3d 1011, 1014 n. 4 (2003). Further, Arizona courts appear to have an established practice of relying upon relevant

federal law for guidance when interpreting employment retaliation claims brought under the Arizona Civil Rights Act. *See Najar v. State*, 198 Ariz. 345 (2000); *see also Storey v. Chase Bankcard Services, Inc.*, 970 F.Supp. 722, 724 (D.Ariz.1997) ("[D]ecisions interpreting Title VII are regarded by Arizona's courts as persuasive authority in interpreting ACRA, unless any particular part of Title VII affords greater coverage."). This again suggests that Arizona courts would likewise rely upon federal case law when interpreting Arizona's newer retaliation statutes, such as A.R.S. § 23-1501. *Gerberry v. Maricopa County,* 2006 WL 774929 (March 28, 2006).

To prevail, Plaintiff bears the burden of establishing that ASARCO terminated her employment because she intended to file a grievance and engaged in protected activity while talking with HR and Union Reps. Plaintiff is not and does not allege in her Amended Complaint that she is a whistleblower. ASARCO argues that it is entitled to summary judgment because Plaintiff did not engage in activity protected by the AEPA and cannot establish a causal link between the allegedly protected activity and her termination, ie, she does not state a prima facie case. Even so, ASARCO has put forth substantial evidence that the reason for termination was not pretext for retaliation for engaging in protected activity, but a pure violation of the BLA code of conduct; she intentionally and knowingly altered formal records and attempted to give herself two extra hours of pay when it was not authorized or promised.

<u>a. Protected Activity</u>

Alcozar-Murphy bears the burden of establishing the elements of her claim. The evidence put forth is meetings with HR and Union Reps about filing a grievance. Under the federal law of employment retaliation, this is protected activity. Shortly thereafter, she was terminated from employment. Based on the undisputed facts and legal arguments, this Court may conclude that Plaintiff engaged in protected activity, suffered an adverse employment action, and therefore has established a prima facie case.

<u>b. Causation</u>

Next, Plaintiff must establish a causal link between the alleged protected activity and her termination. Some cases in this District have assumed that the *McDonnell-Douglas* burden-shifting framework utilized in Title VII cases applies. See *Levine v. TERROS, Inc.,* No. CV-08-1458-PHX-MHM, 2010 WL 864498, at *8-10 (D. Ariz. March 9, 2010); *Cox v. Amerigas Propane, Inc.*, No. CV-04-101-PHX-SMM, 2005 WL 2886022, at *12-14 (D. Ariz. March 26, 2009). This framework determines causation by asking whether "a retaliatory motive played a part in the employment action." *Knox v. United States Rental Highway Techs, Inc.*, No. CIV 07-0297-PHX-DKD, 2009 WL 806625, at *5 (D. Ariz. March 26, 2009) (*citing Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 798 (9th Cir. 1982)). The plaintiff must first establish a prima facie case by offering evidence that she: (1) engaged in protected activity; (2) suffered an adverse employment action; and (3) was terminated as a result. *See Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112-13 (9th Cir. 2003). If the plaintiff makes such a showing, the burden

shifts to the defendant to articulate a legitimate, non-retaliatory reason for its actions. Id. If the defendant articulates such a reason, the burden returns to the plaintiff to show that the reason is pretextual. Id. (Again, Plaintiff does not claim that she is a whistleblower.)

Here, it is undisputed that ASARCO's stated reason for terminating Plaintiff was because it believed that she had falsified the Long Sheet, an internal record, and had improperly given herself two hours of overtime. It is of no moment whether that belief was correct, so long as ASARCO was not substantially motivated to terminate Plaintiff because she consulted with HR and was considering filing a grievance and/or because she had taken FMLA leave.

### c. Pretext

Plaintiff's position is that the termination was in fact pretext for taking the FMLA leave and then complaining about what she perceived as a deliberate delay in return to work by HR, which resulted in her expressed desire to file a grievance.  Evidence of pretext may be direct or circumstantial.

The Ninth Circuit has cautioned that "a specified time period cannot be a mechanically applied criterion" in considering whether an employment decision was retaliatory. *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir.2003); *Rowberry v. Wells Fargo Bank,* 2015 WL 7273136 (November 18, 2015).  Here, the timing might circumstantially suggest retaliation, but the HR meeting on 2/22/13 followed by Plaintiff's termination from employment on 3/4/13 are interrupted in

17

time by the falsification of records on 2/26/13. In sum, circumstantial evidence of timing is not helpful here.

The other factor to consider is whether or not ASARCO followed or violated its own procedures for termination. A chronology of events is helpful to answer this question: On 2/21/13, Plaintiff officially returned to work after FMLA leave into the same position with the same pay. On 2/22/13, Plaintiff and HR/Union Reps have a meeting about HR delaying Plaintiff's return to work and a possible grievance; Union Reps disagree. On 2/26/13, Plaintiff has the meeting with the Union President Duarte before her the start of her work shift lasting approximately 2 hours. On 2/26/13, Plaintiff alters the time sheet to reflect 2 extra hours OT (overtime). (Doc. 75-1 Ex. 14, 15.)   On 2/27/13, the ASARCO Computer system detects Plaintiff's entry into the system to change the record; to enter the computer to increase her pay included calling herself by the title "day pay" supervisor, which she was not for 2/26/13. (Doc. 75-1, Ex. 16.)

| 245677 | Edmiston, Jim | ttT | 420 | 426 | | | | | | | | | |
| 245711 | SaHelberg, Dan coza | DZF | 524 | | | | | | | | | | |
| 246177 | r, Bernadette | DZI | 525 | | 2HRSOT | 227119 | Garcia,  J. | | DZR | 549 | 7HR | OT | 313XI | v |
| 24Il353 | McPeak,  erry | DZI | 516 | | | | | | | | | | |
| 246541 | Myera,  ason | SH | 552 | | | | | | | | | | |
| 246596 | Steinke, Frank | HT | 426 | 426 | | 240964 | Horta, Jesse | | FL | 92 | | | | |
| 246913 | Martinez, Albert | HT | 458 | 400 | | 241266 | Avalos, Ed Gilliam, | | DZR | 40 T | | | | |
| 246931 | Lolt, Da'lid Mills, | ORI | 5 | | | 241772 | Randy Scaggs, | | CABLE CREW | | LEADMAN | | 76422 | |
| 246951 | Fred Morgan, | DZI | 564 | | | 243300 | Billy Archuleta, | | CABL-E CREW | | | | | |
| 246984 | Dean | HT | 405 | 405 | | 244426 | Johnny | | FL | 93 | | | | |

(246177: Doc. 75-18 at 2.)

At this time, Plaintiff: 1. entered the system when she did not have authority to do so; 2.  misstated her status that day as "day pay" supervisor in the computer; 3. attempted to add two hours of overtime – which is more money than regular pay, without permission or

18

authority to do so; and, 4. entered a supervisor's name who had not been asked permission to do any of this; in fact, either the real day pay supervisor or a 5-5 supervisor would have actually had to make the entry because Plaintiff lacked authority that day to make entries into the system.

The next day, the computer generated a document that reflected Plaintiff's access the day before. (DSOF, Ex. 17.) On 2/27/13, Plaintiff received a Notice of Disciplinary Action: she was suspended and advised of a future hearing (Ex. 20). On 3/1/2013, Plaintiff received another Notice of Hearing, which involved fact finding for the unauthorized log-in. On 3/4/13, a hearing was conducted and Plaintiff was terminated for violation of BLA Rules of Conduct #5 and #20[5] (DSOF, Ex. 23). On 3/19/13, Plaintiff had her "third step" hearing to grieve the termination. (DSOF, Ex. 24). On 3/26/13, her Union representatives requested termination arbitration and on 11/25/14, the Union scheduled her arbitration.

There is no evidence submitted that ASARCO violated its own procedures when it terminated Plaintiff. The procedures are contained in the BLA. (Doc. 65-2, ASARCO MSJ at Ex. 6.) BLA Art. 5, Sec. I, 9.b.(2) suspends the routine grievance procedure when the offense involves dishonesty and/or theft such that immediate discharge without benefit of progressive discipline is deemed warranted.[6] This is what

---

[5] "5. Stealing or unauthorized possession of company property…20. Falsifying company records or making false statements." (Ex. 23).

[6] BLA I. 9 b.(2):"…Offenses which endanger the safety of employees or the plant and its equipment…destruction of Company property; gross insubordination… theft; activities

19

occurred in Plaintiff's case and this is the procedural rule of conduct ASARCO utilized to terminate Plaintiff.   Being a day pay supervisor is an honor and a reward for being a trusted, reliable employee; a means of delegating management-type duties and responsibilities.   Part of the honor system involves not inappropriately accessing and altering the computerized Long Sheet

The burden is on the Plaintiff to produce evidence that the reason for discharge was pretext and she does not meet that burden. COUNT ONE of the Amended Complaint will be dismissed.

**B. Claims Against the Union**

While on the bench during oral argument, the Court granted the USWA #5252 motion for summary judgment. The Union timely filed a grievance protesting the Plaintiff's termination. The Union conducted an investigation about the underlying events and scheduled an arbitration.

Plaintiff asserts a "hybrid" claim under Section 301 of the Labor Management Relations Act, 29 U.S.C. §158 et seq. *See Vaca v. Sines*, 386 U.S. 171 (1967). Under that section, the Court held that an employee could sue his employer and union under section 301--either separately or in a single suit--and that, after proving that the employer violated the labor agreement and the union breached its duty of fair representation, he may be entitled to recover damages from

---

prohibited by A… the Company has just cause to impose immediate discharge without benefit of progressive discipline."

both the employer and the union. Since *Vaca* the Court has made it clear that the claim alleging a breach of the labor agreement is a statutory claim deriving from section 301, while the claim alleging a breach of the Union's duty of fair representation is a judicially implied claim necessitated by the special relationship that labor law creates between union and employee. While formally two separate causes of action, an employee's two claims in a hybrid section 301 suit are also "inextricably interdependent" and comprise a departure from the private settlement of disputes pursuant to a collective bargaining agreement. Plaintiff seeks damages from both the union and the employer due to the union's failure to fairly and properly represent her during the grievance process.

Plaintiff claims that the Union breached its duty of fair representation when it failed to "fairly and reasonably" represent her. Yet, in her deposition, Plaintiff clarified that the only basis for her claim is the delay in scheduling the Grievance for arbitration

A union only breaches the statutory duty of fair representation when its "conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca*, 386 U.S. at 190. Both the Supreme Court and the Ninth Circuit have "stressed the importance of preserving union discretion by narrowly construing the unfair representation doctrine." *Johnson v. United States Postal Service*, 756 F.2d 1461, 1465 (9th Cir. 1985) (internal citations omitted). This discretion is especially important when evaluating a union's handling of grievances: "[c]ourts may upset union decisions on employee grievances *only if* the union shows reckless disregard for an

employee's rights." *Id.* at 1465 (emphasis added) (internal citations omitted).

Far from showing "reckless disregard" for Plaintiff's rights, the Union immediately filed the Grievance, protesting Plaintiff's termination. When the parties were unable to resolve the Grievance, the Union appealed it to arbitration. (Separate Statement of Facts ¶ 19). The Union then made several attempts to schedule the arbitration with the Company. In a very similar case, *Dente v. Int'l Org. of Masters, Mates and Pilots, Local 90*, 492 F.2d 10 (9th Cir. 1973), the plaintiff filed a grievance over his discharge. Because the local union was involved in contract negotiations, the parties did not arbitrate the plaintiff's grievance (along with many other grievances) until almost a year later. *Id.* at 11. The Court found:

> Examining the entire record, we find no evidence that the union "unfairly represented" Dente in a manner for which compensation is available under *Vaca v. Sipes supra*. We can perceive no union conduct that was performed in bad faith or that could be characterized as arbitrary or discriminatory. The worst that can be said of the union's conduct is that it was negligent, and this of course is not enough. For whatever can be said of the union's delay in processing the grievance and moving to arbitration, it was not that kind of "arbitrary abuse" giving rise to damages under section 301.

*Id.* at 12 (internal citations omitted); *Aparicio v. Potter*, 136 Fed.Appx. 14 (9th Cir. 2005).

Plaintiff's only basis for her claim that the Union breached its duty of fair representation is the inadvertent delay in scheduling the Grievance for arbitration. Nothing distinguishes this case from

others, where courts have found no breach of the duty when the only issue is a backlog delay in processing a grievance. In a hybrid claim, Plaintiff must establish both a breach of the duty of fair representation and a contract violation and she does neither. *Vaca*, 386 U.S. at 187.

**RULING**

There are no material questions of fact precluding entry of summary judgment in favor of Defendants on all claims in both motions for summary judgment. This ruling renders the Crossclaims moot.

Accordingly,

**IT IS ORDERED** that both motions for summary judgment (Docs. 62, 64) are **GRANTED** in favor of both Defendants and against Plaintiff. The Clerk of the Court is directed to enter a Final Judgment reflecting this Order.  The Complaint and Crossclaims are dismissed and the action is terminated.

**IT IS FURTHER ORDERED** that Defendants ASARCO Arizona Inc. and ASARCO Grupo Mexico were dismissed as parties by the state court prior to removal and the Clerk's Office is directed to reflect this on the docket. (Doc. 21.) The remaining ASARCO Defendant was ASARCO LLC and now this Defendant is also dismissed from this action.

Dated this 23rd day of February, 2017.

Honorable David C. Bury
United States District Judge